and Teresa Pardenas. Good morning. Good morning. May it please the court, I'm Jason Waymire. I'm here on behalf of Deputies Teresa Pardenas and Kevin Casal of the Gwinnett County Sheriff's Office. This is our appeal from denial of qualified immunity and there are four federal claims before the court. There's a handful of state law claims and we assert official immunity as to those claims. The four federal claims are for illegal entry of a residence, a protective sweep of a residence, a taser excessive force claim, and then what the district court characterized as a right to bodily privacy claim. Unless the court directs me otherwise, I plan on focusing on the taser claim because it's the most fact-intensive and it seems to me likely to take the most time. So qualified immunity... Fact-intensive might not be good for you, huh? Well, it might require a lot of discussion and I certainly hope so. But at any rate, the other ones I think are not as fact-intensive. Qualified immunity asks whether the law is clearly established beyond debate that the officer stepped over a line that exists when that officer acts that the officer should have known about. In the use of force context, of course, it's a multi-factor test that takes into account all the facts and circumstances. The closest thing here to a bright line rule that I can find is stated in the Zinovinovich case v. Barner and it's this. The use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force. That's the closest thing to a bright line rule I can find here and that's what we've got. And so that, in my view, is the rule that applies. Let me go through the... So what we're talking about is the tasing by Deputy Pardenas of Mrs. Brand, right? That's true, Your Honor. Okay. It's solely a claim against Deputy Pardenas. So shouldn't we be talking about the gram factors and not how you evaluate an excessive force claim? That's true, Your Honor. Okay. So what was the... I mean, when Deputy Pardenas came into the house, Mrs. Brand had not committed any crime, right? I disagree, Your Honor. In fact, the district court found otherwise. The district court found that there was probable cause that Mrs. Brand had already committed third-degree cruelty to children, which requires, as an element, her to be the primary aggressor. Okay. So that's what you say is for the underlying crime, which is the first gram factor. There's at least one... Her cruelty to children crime? Yes, Your Honor. Okay. That's undisputed here. At least that's the district court's holding that there's probable cause for that offense. There are other offenses here. Did you make that argument to the district court? Yes, Your Honor. I mean, in your brief, it looked like to me your argument was Deputy Pardenas had the right to tase Mrs. Brand because she refused a lawful command to put down the telephone. That is a second part of it. That's what happened immediately before the taser happened. And had Mrs. Brand committed the crime of cruelty to children at that point in your view? Yes, Your Honor. Mrs. Brand committed certain offenses when she resisted Deputy Casale at the front door before Deputy Pardenas ever got there. The circumstances are that Deputy Pardenas was at the back of the house. She is in radio contact with Deputy Casale. She hears she does a status check. She asks him for the status. He doesn't respond, so she knows there's something wrong. Then he calls for her to come to the front of the house, and he calls for other backup officers. Then she knows something's wrong. So she runs around. She sees a scuffle and a fight in front of the house with Deputy Casale. Well, there was evidence that she couldn't have seen the scuffle, so don't we have to assume that she didn't see it? I'm not sure, Your Honor, what you're referencing. Nobody else had Deputy Pardenas. It was coming around the side of the house and because of the elevated location of the porch. There are photos in the record of the porch from the place where roughly Deputy Pardenas was. So a person in her position could see that there was a scuffle going on. Now, she mainly saw Deputy Casale's part of it, which is him getting pushed back and somebody from within the house pushing and throwing punches at him. Because Mrs. Brand is inside the house at this point, right? Mrs. Brand's testimony is that, yes, she was inside the house, except when Deputy Casale tried to pull her out. Regardless, Deputy Pardenas goes up the stairs. Deputy Pardenas goes into the small enclosed foyer area. She has her taser drawn. She's surrounded now by four people from within the house. There had just been a fight with Deputy Casale, and Deputy Pardenas is now faced with a volatile situation. Mrs. Brand acknowledges, admits that she was still very, very excited. And she's . . . You're referring to the district court order. So I just want to go back to the Graham factors. The second one is whether or not Mrs. Brand posed an immediate threat to the safety of the officers. And the district court order says, quote, defendants have not offered any evidence in conjunction with their summary judgment motion indicating that Mrs. Brand made any aggressive move toward either officer. I disagree with that. Frankly . . . You don't disagree that the district court said that. Oh, the district court said that. No question. I disagree with that conclusion. And the conclusion I disagree with primarily because there's already a finding that there's probable cause that Mrs. Brand committed a felony offense. Didn't you adopt the plaintiff's version of the facts about her interaction with the two deputies? So let me explain that. Yes. Well, the standard for summary judgment is that you believe the plaintiff's story and presume that it's true. So in that sense, yes, because that's what I have to do. It's a waste of time for me to just tell my officer's story because if the plaintiff's story conflicts with that, then the district court, of course, has to take the plaintiff's story. But we do, too. Yes, exactly. So if you don't submit anything in your statement of material facts, then we're bound by her facts, just like the district court was. Well, within our statement of material facts, there are facts that support that Mrs. Brand resisted physically, was subject to felony obstruction and cruelty to children, and that when the taser went off, she had disobeyed a lawful command, namely drop the phone. Going back to Judge Pryor's question, what is the evidence that Officer Pardinis knew that Mrs. Brand arguably assaulted Officer Cassell? Let's assume that you're right, that the pictures show you could have seen it and that she testified she saw Cassell falling backwards. How does she know which of the four people committed the assault at that point? So when Deputy Pardinis comes in, she already knows there's been a fight. She has a discussion with Mrs. Brand, and Mrs. Brand explains that she's part of the fight, that she is part of this physical confrontation that Deputy Cassell tried to come in, and she didn't want him to come in, and now she's demanding that Deputy Pardinis leave the house. So clearly Mrs. Brand is saying to Deputy Pardinis, I'm part of this confrontation. Deputy Pardinis, on the spur of the moment, probably can't sort out who started what, who did what to whom, who's the aggressor, and so forth. She knows, though, that Mrs. Brand is part of this confrontation, part of this physical fight, and Mrs. Brand is still excited. She could have just tased anybody. I'm sorry? She could have just tased anybody. No, I disagree, Your Honor. She couldn't just tase anybody, but there is now, within a minute of Deputy Pardinis getting in the house, there is Mrs. Brand saying, I'm going to get a phone. Deputy Pardinis says, drop the phone. She says, no. So you're back to the argument. Is Mrs. Brand's disobeying an order from Deputy Pardinis justifies the tase in your view of the world? Not solely. That's not the only thing. That's not the totality of the circumstances here. The totality of the circumstances is we've got a violent confrontation and an officer who needs to exert control over a scene, and Mrs. Brand is a large, unrestrained felon at this point who is disobeying a lawful command. Deputy Pardinis is in a small, enclosed space. She's got other people who are combatants who are not obeying commands, so she needs to exert control over that scene. Michigan v. Summers says that everybody's safer when officers are able to exert control over a scene like this. So that's part of what's going on. Just to touch on your other two arguments. In terms of Deputy Casale's instruction to the other officers to do a protective sweep, is it your reading of Bowie or anything else that the officers would have been allowed to look in drawers as a part of a protective sweep? There are cases that deal with that sort of issue, and they're mixed. I think a protective sweep is limited to places where a person can hide because that's what a protective sweep is for. Deputy Casale didn't tell anybody to look in drawers, and he's not responsible. But there's testimony that they did look into drawers, right? I believe one or more of the plaintiffs said something along those lines. Okay. And then the other, the bodily privacy claim, there's also deposition testimony that her chest was completely exposed. Wesley Brand's deposition, quote, left breast was out, totally out. Right? I mean, that's part of the record, isn't it? That's Wesley Brand's testimony. Mrs. Brand's testimony is that she was wearing her brassiere and that the shirt, she has a shirt on, it's ripped, there's a picture of the shirt in the But that her breast was exposed. With a brassiere over the top of it. Well, but I mean, her testimony was that her breast was exposed. Right? I think along those lines, I can't remember the specifics. I mean, it may have been that Can I just ask you, I mean, why not give her a shirt? I mean, are you, you're not defending the officer's unwillingness to just give her a shirt. I mean, her husband's standing there saying, can I give her my shirt? And according to the testimony, no, you can't give her your shirt. I mean, wouldn't it be better for us not to be sitting here talking about that if the officers had just covered her up like she asked for them to? So my answer is twofold. One is we have to believe the plaintiff's story. I don't exactly believe the plaintiff's story about that being the way it happened. But regardless, for purposes of summary judgment, we have to believe the plaintiff's story. So the shirt covered different areas of the body. It could be arranged to cover Mrs. Brand's breast area. I mean, you represent these folks. I mean, maybe you should have a conversation with them. Look, just give the people something to cover their bodies up when they're in this situation. In my experience in representing officers for years and years, very few would refuse to do exactly what you have said. I agree. I agree. And I think these officers are in exactly the same category. I just don't think it really happened the way that the plaintiff said it happened. But so now you're making a jury argument. Well, you're saying talk to your officers and they should do it a certain way. I think they do it a certain way, and I think that's the way it's normally done. All right. I appreciate you responding. Thank you. Well, can I ask just one question along the lines of that particular issue? Of course. One thing I was curious about is we're assuming here that the Officer Cassell or Officer Pardena is one or the other, wasn't in control of the situation the whole time. It's my understanding that once the paramedics arrive, they're the ones who would have been in control of that issue. Am I right or wrong about that? In control of the shirt? Yes, well, in control of Mrs. Brandt. That the officers would have backed off and let the paramedics decide what they're going to do in terms of covering her up. Am I right or wrong, or is there any evidence of that one way or the other? That's normally the way it works. The officers have to make sure that the scene is secure and that the paramedics are safe. Once the paramedics are safe, then they come and deal with the patient, and the police back off and are in charge of security. I hope that answers your question. Thank you. Thank you. Your Honor, we do look at the facts from the non-movement's point of view, and the problem is that counsel is always looking at the facts from the movement's point of view. Even just now, there's no evidence that any of these people were belligerent. One of them was holding a baby, for God's sakes. And, in fact, if they were that belligerent, then why weren't they handcuffed or anything else during the protective sweep? They just walked around while the officers went through the house. And one of the things the officers did, pursuant to Mr. Casale's instructions, and he admits that he instructed the officers to go through the house, is they opened up a locked garage door to see if anybody was in it. So, I mean, we have to look at the evidence from the point of view of the people opposing summary judgment. Now, Judge Totenberg did not find that there was cruelty to children. She said, if those charges were substantiated, was how she put it, and she did that at page 37, footnote 25 of her second order on summary judgment, the one that we're here for today. So that didn't happen. According to Ms. Pardinis, I asked her this question on deposition. You went through this whole thing and you didn't mention any commands. Well, she didn't. She said, yes, you're right, I did not mention any commands. And that's at page record 48 at page 64, her deposition. She didn't give any warning. She shot Ms. Brand in the back. She shot Ms. Brand as Ms. Brand was going away from her, when Ms. Brand was on the fourth step of the stair. In her incident report, she said basically that she was, she phrased it that she was afraid that possibly, possibly she might be going to search for a weapon. She got shot in the back. She was running away from running. She was moving as fast as she could because she had a problem with her foot. She had injured her foot years before. So she didn't run particularly fast. So she was moving away from the officer up the stairs. And this is the ironic part of it. She was moving to call the police. So here she is. Well, I'm not sure that helps you. I actually think that works the other way. If Ms. Brand was just standing there with the phone in her ear saying, I'm calling 911, that seems to me to be almost a stronger case than saying she's running up the stairs and an officer, Pardinis, isn't sure where she's going or what she's going to do when she gets to the top of the stairs. To me, that's actually a stronger case from Pardinis' standpoint. Well, Your Honor, I think the question is what does she say in her incident report that she was possibly, that she was maybe possibly going to get? I mean, the point is she doesn't know what she's doing. Did she say she commanded her to stop? Your Honor, when I asked her that specific question at page 64 of her deposition as she went through what had happened, I specifically asked her, you didn't make any comments about a command? And she said, no, I didn't. That's at page 64 of her deposition. So, no, she didn't make any command to stop. She didn't give any warning that she was going to Taze. At that particular point, she was not under arrest. And this court has basically held that if you haven't been charged with a crime, which at that particular point she had not been charged with a crime, that you can't be evading arrest. And that was the Howard case. I mean, Howard v. Hudson at 613 Federal Appendix 866. The three standards, the severity of the crime. Now, she was charged with this. She went to trial. She was acquitted of all these charges. The severity of the crime has to do with what happened allegedly with Mr. Casale. You know, I wasn't there. All I know is that a jury acquitted my client of that. Mr. Casale went in even after the person that they were looking for went to the porch and said, I'm a person. He still wanted to go in. He stuck his foot in before he knew anything about what was going on, and he wouldn't get out. And all she was trying to do was keep him out of the house. She had the quaint notion that the house was her castle. The immediate threat, she was not an immediate threat to Ms. Paradinas. She was not an immediate threat. And we get back even to the standard operating procedure of Gwinnett County, which says what you don't know cannot be a basis for using this kind of force. So the standards and the facts looked at from my client's point of view do not justify in any shape or form what happened. With regard to Officer Casale putting his foot in the doorway, the district court found that there was a continuing violation because of that, even though he subsequently learned that Wesley was in fact inside the house. And it seems to me at that point, once he knows that Wesley is inside the house, that that cuts off his liability. I'm wondering what authority there is for the district court's position on that. Well, Your Honor, I know that I argued it the following way. I thought he had no business being in the house, period. But I also argued that the moment that he put his foot into the door, that under O'Rourke and Chialo and the Supreme Court, that he had broken the curtain, broken whatever that magic line is from outside the house into the house. And at that point when he did that, he testified that he didn't know anything about whether or not this gentleman was at the house. Now, the problem, of course, is set out in a footnote by the court because she's being more forthright than any of us. The problem is that the warrant they had identified Wesley as a 27-year-old male. For our purposes, the problem is that Wesley was 17 or 18 years old and he was living as a woman. And that was part of the problem because Mr. Casals kept saying, I need to see this 27-year-old man. And nobody could figure out what he was talking about. So he stuck his foot into the door and she said, you can't go in. And he demanded to go in. And even after Wesley presented himself or herself, as the case may be, he continued to want to go in and check. And Wesley identified himself as the person that they were looking for. So I argued it solely that he had broken the line. Now, I should say that I made a number of other arguments about that, and Judge Totenberg ruled against me on those arguments. So let's assume that Officer Casals had no justification for sticking his foot in the door. But then after Wesley comes out and goes back into the house, he knows that Wesley is in the house. Wesley said— So at that point, it seems to me he's justified in going in pursuant to the arrest warrant. Am I wrong about that? I think the problem is that he presented himself outside the house to Mr. Casals, and Mr. Casals didn't do anything. But for my purposes, my purposes, I was arguing for the thing that I survived on, that sticking your foot in the door without any knowledge is a violation of the Fourth Amendment. I agree with Judge Pryor. I think she's hit on the weakest part of the district court order. I mean, the deputies have a warrant for Wesley Brandt at 4179 Valley Brook Road. They go to the house. The first person they encounter seems to acknowledge that, yep, there is such a person that lives here. Let me go ask his mother or get his mother or whatever. So, I mean, if all he needs is a reasonable belief that the person who's the subject of the arrest warrant is there to go in the house and look for him, then he's got that, doesn't he? Your Honor, I think you said differently, United States v. Reynolds, when you were on the district court. There are two parts to this. Did I get reversed on that?  And numerous district judges have cited you from the northern district, although I must tell you I can't find an 11th Circuit case citing it. But what I would say is there's a two-part test, two-part test. You have to know that somebody lives there and that somebody is there. No, I don't think that. The evidence was . . . I thought the test was you had to have reasonable belief they're there, not knowledge. See, Judge Malloy would reverse me. I think Judge Moy disagreed with you, but . . . Well, I'm sorry. You're on the 11th Circuit and he's not. That's the best way I can put it. Oh, he is today. Oh, I'm sorry. I thought you said Judge Moy. Excuse me, Judge Malloy. I apologize. What I think I would say is that Mr. Casale admits he testified that he didn't know whether Wesley was there or not when he originally stuck his foot in the door. And Judge Totenberg ruled, I think correctly, that it sounded like a post-incident rationalization. But we're supposed to look at objective reasonableness, aren't we? Well, then the question is what did he have? The answer was that he had conflicting events. They had done no investigation, as you said in Reynolds they should do. I have no memory of that case, just so you know. Your Honor, it's a great case. Well, I'm glad you like it. That's all I'm going to say. I'm not sure it's going to carry the day today. What I would say is they had done no investigation, but they had a warrant with that address. And they also had— Are we talking about Reynolds or are we talking about this case? No, in this case. In this case. They had done no investigation, as in Reynolds and this case. They had a warrant that listed his address at this particular place. But they also had a statement from jail three months earlier where they had put down that his address was unknown. So it wasn't like they only had the warrant and they had done an investigation. They had done no investigation, they had no knowledge, and they had that conflicting evidence. So they had evidence one way and evidence the other way. How can you say that Pardinis had reasonable suspicion that he was there and Cassell didn't? When they both had the same information when they drove up? Well, Your Honor, I must tell you that I did not say that. I know you didn't, but I guess I'm just— And Judge Totenberg ruled against me on that. How can the judge—it seems to me that's logically inconsistent. When they both have the same violation, violating the curtilage, they both have exactly the same knowledge, and they're both there at the same time. How can one be—how can one have reasonable suspicion and the other not? Your Honor, I agree with you. That's my argument. That was my argument. I didn't get a chance to appeal. It's not a final judgment. But I agree with you completely. I don't think he had any—she had any business going into the curtilage. And that—the only difference I could see is that she went into the curtilage and Mr. Cassell stuck his foot inside the door. If you have any other questions, I'd be glad to answer them. But if not, I'm just going to sit down. I want to just go back to the Taser incident for a minute. And I'm looking at the district court order. And the district court judge said, according to the plaintiff—she's taking your version of the facts— Deputy Pardenas ordered Mrs. Brand to drop the phone. Now, you said there wasn't a command, but she said, according to your facts, there were. That's what she's basing her decision on. And then she didn't drop the phone but instead responded that she was calling 911. So, assuming you have a person who you may have reasonable suspicion committed an offense, who's standing there calling 911, I presume your position is that doesn't justify Tasing, at least without a warning. That is my position. That is my position. I mean, if you look at the gram factors, I don't see how the gram factors can weigh against my client. I just don't. I guess I was taken aback. You said there was no command, according to the district court order. Your Honor— She said that that was your position, that there was a command. Your Honor, I was quoting Ms. Pardenas' deposition at 64. Whether or not I'm wrong on this point, I don't see how the gram factors allow that kind of Taser. You have repeatedly talked about proportionality and the gram factors give you the right to figure out what are the factors. In this particular case, they didn't give a warning. That's another factor, although it's not required. It certainly is a factor. There has never been a case that I can find where somebody was allowed to Taser somebody in their own house. I don't think you ought to start a trend the other way. That's all I'm going to say about that. Thank you. Back again. I believe that Judge Martin was on a panel where recently a person was Tasered in their house and that use of force was upheld. It was Smith v. LePage, I believe. There is a case like that, Mr. Goldberg. Let me talk about a case that we recently submitted a supplemental brief on. It's the Jones v. Michael case, which is very, very similar to this case in our view. It was a letter brief about a week ago. In this case, it's a pepper spray case, but that doesn't matter in our view because pepper spray and a Taser are about the same level of force. In the Jones v. Michael case, there was a disturbance. There was an arrest. Then a gentleman named Bass was trying to get to the police, and the police were holding him back. He was kind of fending them off with his arms. That's all that he did. That supported an offense. Then later, within about a minute, he's talking on his cell phone. He is still agitated. Four officers walk up to him. They don't give him any command. He kind of ignores them. Then an officer uses pepper spray on him. He falls to the ground. He's pepper sprayed again. This court held there's no Fourth Amendment violation here. Is he doing anything that threatens officers at that point? No. He was guilty of an offense, a fairly minor offense. He was part of a disturbance, and he's talking on a phone. Officers don't tell him to put the phone down, but they pepper spray him anyway. That's a legitimate use of force. Here, I think we have a stronger case for use of the Taser than the Jones v. Michael case. So far as clearly established law, is it clearly established beyond debate that Deputy Pardenas can't use a Taser in this circumstance? No, I don't think so. But the gram factors are established beyond debate at this point, aren't they? They are, but it's a multi-factor test, and the test really deals with the totality of the circumstances. Scott B. Harris says there's no magical on-off switch. There's no specific, you know, magical test. Rather, it's totality of the circumstances. So, again, I go back to the rule that the use of a Taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward the police is not excessive force. That's the closest thing to a Bright Line rule I can find. Let me talk about Deputy Pardenas and her account. If we're going to go with her account, which Mr. Goldberg seems willing to do, yes, there wasn't an instruction or a warning. Rather, Mrs. Brand just takes off, goes and runs up the stairs, and that is precisely why Deputy Pardenas fired the Taser. Mrs. Brand's story is different, so we have to tell her story and presume that her story is correct for purposes of summary judgment. Her story is she refused a command to drop the phone, and she explains to Deputy Pardenas that she was part of this scuffle that happened less than a minute before the Taser goes off. So, is it appropriate to use a Taser in this circumstance? Yes, especially in this volatile situation where there are multiple combatants. Wesley Brand pled guilty to felony obstruction for fighting with Deputy Casal. So, there's a strong need to use force here, and it was appropriate. It's a fairly low level of force. It's over quickly. It diffused the situation fairly well. So, that's our argument on that. In regard to the illegal entry claim, I don't think the district court reached whether there was reasonable belief that Wesley Brand was there at the time. In a different order, I think the district court ruled that, you know, based on this court's precedent, when it's 11 o'clock at night, you can presume that a person who lives there is home at the time. In fact, and so that presumption carried the day on that particular issue. So far as whether this is his residence, I agree with you, Judge Malloy, that it is inconsistent to hold that one officer has reasonable belief and the other officer doesn't. Furthermore, there's a presumption in this circuit that where a person gives their address, you know, six months before, that the police can rely on that and presume that six months later it's still their address. Well, here the information is given four months. It's a booking report where Wesley Brand gives this address as his home. So, is there reasonable belief? Yes. I mean, that's the presumption that the police are allowed to rely upon. And then when Deputy Casale gets there, he runs the car tag. It belongs to Mr. Theodos Brand, who is probably related to Wesley Brand, the person they're looking for on this felony warrant. And then Ms. Velazquez knows Wesley Brand, knows who he is. So that substantiates reasonable belief that he's living at this place. My time is over. Thank you. We appreciate you coming and appreciate the argument. And that concludes our cases for the day. So we will recess until 9 o'clock in the morning.